# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 21-169

THE SWEET LAKE LAND AND OIL COMPANY, LLC

VERSUS

OLEUM OPERATING COMPANY, L.C., ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2010-1272
HONORABLE DAVID RITCHIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN E. CONERY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, John E. Conery, and Candyce G. Perret, Judges.

**AFFIRMED AND RENDERED.**
**MOTION TO DISMISS ANSWER GRANTED IN PART**
**AND DENIED IN PART.**
**ATTORNEY FEES AWARDED FOR WORK PERFORMED ON APPEAL.**
**REMANDED.**

**Pickett, J., dissents and assigns written reasons.**

**Guy E. Wall**
**Paul E. Bullington**
**Jonathan R. Cook**
**Sara M. Lewis**
**Wall, Bullington & Cook, LLC**
**540 Elmwood Park Boulevard**
**Harahan, Louisiana  70123**
**(504) 736-0347**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **The Sweet Lake Land and Oil  Company, LLC**


**Alan J. Berteau**
**R. Benn Vincent, Jr.**
**Matthew B. Smith**
**Hattie V. Guidry**
**James Patrick Dore**
**Kean Miller, LLP**
**Post Office Box 3513**
**Baton Rouge, Louisiana  70821**
**(225) 387-0999**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
     **Sohio Petroleum Company**
     **BP Exploration & Oil, Inc.**
     **BP Products North America, Inc.**


**Kelly B. Becker**
**Liskow & Lewis**
**701 Poydras Street, Suite 5000**
**New Orleans, Louisiana  70139**
**(504) 581-7979**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
     **Sohio Petroleum Company**
     **BP Exploration & Oil, Inc.**
     **BP Products North America, Inc.**


**Paul Matthew Jones**
**Brian W. Capell**
**Liskow & Lewis**
**Post Office Box 52008**
**Lafayette, Louisiana  70505**
**(337) 232-7424**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
     **AKSM, L.C.**
     **Oleum Operating Company, L.C.**

**Thomas E. Balhoff**
**Judith R.E. Atkinson**
**Carlton Jones, III**
**Roedell Parsons Koch Blache Balhoff & McCollister**
**8440 Jefferson Hwy. Suite 301**
**Baton Rouge, Louisiana  70809-7652**
**(225) 929-7033**
**HEARING OFFICERS FOR:**
**Louisiana Department of Natural Resources**


**Guillermo A. Iturralde**
**Hearing Officer**
**Louisiana Department of Natural Resources**
**Office of General Counsel**
**Post Office Box 94396**
**Baton Rouge, Louisiana  70804**
**(225) 342-2710**


**F. Jonathan Rice**
**John W. Adams**
**Louisiana Department of Natural Resources, Office of Conservation**
**Post Office Box 94275**
**Baton Rouge, Louisiana  70804**

**CONERY, Judge.**

Plaintiff Sweet Lake Land and Oil Company, LLC (Sweet Lake) pursued this legacy oilfield litigation against British Petroleum corporate entities (BP), among others, seeking remediation and damages associated with decades-long oilfield operations on its property. After a 2015 trial at which a jury determined BP to be solely responsible for environmental damage on the property, the trial court referred the matter to the Louisiana Department of Natural Resources (LDNR) for development of a most feasible remediation plan pursuant to La.R.S. 30:29 (sometimes referred to as Act 312). With no final remediation plan approved by 2020, and citing the lengthy delay after the initial referral for a remediation plan under La.R.S. 30:29, the trial court issued an interim award of fees and costs, and designated that judgment as a partial final judgment subject to immediate appeal. BP appeals, questioning the certification of the judgment as final, the referral to remediation under La.R.S. 30:29, and the award of attorney fees and costs. By Answer to Appeal, Sweet Lake seeks a new trial on the jury's rejection of its private causes of action against BP and seeks additional attorney fees for work performed on appeal. BP further moves to dismiss Sweet Lake's Answer.

## FACTS AND PROCEDURAL HISTORY

Sweet Lake is the historical owner of Section 34 in Township 10 South, Range 6 West in Calcasieu Parish. Although the record indicates that the larger Sweet Lake property is multi-use, a succession of oilfield operators has performed exploration and production on the portion of the property at issue. Sweet Lake filed this oilfield legacy suit in 2010 seeking remediation of the subject property by its operators under two pertinent oil, gas, and mineral leases, and seeking additional damages in tort and contract.

Sweet Lake granted the first Oil, Gas and Mineral Lease in April 1947 (the 1947 Lease) to J.A. Bonham, a lease broker, who immediately sold and assigned his interest to Sohio Petroleum Company, a predecessor of BP. Sohio drilled a gas well on the property in 1948 and later added additional oil and gas wells which resulted in alleged contamination, including contamination by "produced water."[1] Sohio initially used clay-lined pits for disposal of the produced water and, in 1957, added the first of two saltwater injection wells to the property for that purpose.

In 1989, the Louisiana Department of Conservation amended Order 29-B pertaining to oilfield pit registration, closure, and remediation. Sohio began the process of closing and registering its clay pits.[2] During that time period, BP acquired Sohio (hereinafter collectively referred to as BP). BP assigned the 1947 Lease to Jerry Suire in 1989, who in turn conveyed his interest to Flash Gas & Oil Northeast, Inc. (Flash). Numerous smaller operators thereafter worked the property, including Janex Oil Company, Arbol Resources, Inc. (Arbol), J&J Onshore Production, Inc. (J&J), Panterra Energy Group, LLC (Panterra), Oleum Operating Company, L.C. (Oleum), and AKSM, L.C. By a 2003 Amendment resulting from litigation[3]

---

[1] The Louisiana Administrative Code defines "*Produced water*" as "liquids and suspended particulate matter that is obtained by processing fluids brought to the surface in conjunction with the recovery of oil and gas from underground geologic formations, with underground storage of hydrocarbons, or with solution mining for brine." LA. ADMIN. CODE tit. 43, Pt. XIX § 301.

[2] Order 29-B required the registration and closure of oilfield pits as they existed at that time. Now set forth in LA. ADMIN. CODE tit. 43, Pt. XIX § 101, *et seq.*, Order 29-B provides general requirements for operation of oil and gas facilities as well as requirements for the plugging/abandonment of wells, the operation/closure of oilfield pits, the operation of wells and surface facilities, and the storage, treatment, and disposal of non-hazardous waste. Order 29-B also provides for the remediation of contaminants to designated standards.

[3] In March 2000, Sweet Lake filed suit for lease cancellation and damages contending that the 1947 Lease had terminated or lapsed for various reasons. *See Sweet Lake Land and Oil Co. v. J&J Onshore Prod. Co.*, bearing 14th Judicial District Court Docket Number 2000-001653. The parties entered into a May 28, 2003 settlement agreement, which obligated the parties to amend the 1947 Lease. Suit was dismissed in July 2003.

between Sweet Lake and Oleum and J&J as defendants, the acreage subject to the 1947 Lease was reduced. The 2003 Amendment further imposed remediation obligations on Oleum.[4] Oleum continued as operator for five years, with the 1947 Lease terminating in 2008.

Sweet Lake entered into a second lease on March 1, 2008 (the 2008 Lease) with AKSM. The 2008 Lease permitted AKSM to continue operations on certain acreage, but required it to abandon the area of historic BP operations, designated as the "Existing Oil Facility," and to remove "any contaminated soil" from that area.[5] AKSM permitted Oleum, a related company, to act as the operator on the property.

---

[4] The 2003 Amendment imposed remediation obligations as follows:

II.     The 1947 Lease is hereby amended by the inclusion and addition of the following paragraphs:

. . . .

16.     Within 24 months of the execution date of this Amendment of Oil and Gas Lease, Lessee shall evaluate and establish production in the SLL&O C-2, C-3, C-7, and C-8 Wells. If at the expiration of the 24 month period, any one of the C-2, C-3, C-7, or C-8 Wells have not been evaluated, or are not producing in paying quantities, and Lessee is not actively conducting mining operations on said nonproducing wells, or fails to continue such operations without the lapse of more than 90 days between the abandonment and resumption of its work to restore production of oil or gas in paying quantities, Lessee shall plug and abandon said nonproducing well and restore the site to the requirements of Title 43, Statewide Order No. 29-B within 6 months of the cessation of production in paying quantities or within 6 months of ceasing operations to establish production in paying quantities.

17.     Within 6 months of determining that any well among the Nos. C-2, C-3, C-7, C-8, or C-9 Wells have no future utility, Lessee shall plug and abandon the well and restore the surface area around the well to the requirements of Title 43, Statewide Order No. 29-B.

18.     Lessee shall plug and abandon the C-4 Well and restore the site to the requirements of Title 43, Statewide Order No. 29-B within 6 months of the date of this Amendment to Oil, Gas, and Mineral Lease.

[5] The 2008 Lease provides, in part:

(j)     Existing Oil Facility. LESSEE agrees to *abandon the existing oil facility, located West of the Lands subject hereto and shown on Exhibit A, remove the tanks and other equipment, remove any contaminated soil and transport same for disposal of same off of the lands of LESSOR and to conduct a site assessment*

3

Sweet Lake initiated this suit in March 2010, naming BP and the other operators as defendants. It claimed that its contamination concerns had not been addressed, despite the contractual and legal obligations in place. Sweet Lake identified the operative leases, described the sixty-plus years of production, and alleged that:

> Defendants' operations on the Property contaminated the soil and groundwater with produced water, oil, drilling muds, technologically enhanced naturally occurring radioactive materials (sometimes referred to as "TENORM"), hydrocarbons, metals, and other wastes, toxic or hazardous substances and pollutants (sometimes collectively referred to as "substances"). Defendants also left scrap equipment, pipelines, concrete and other debris (sometimes collectively referred to as "scrap") on the Property.

Sweet Lake maintained that "[t]he substances released onto the Property by each defendant combined with the substances left by the other defendants to contaminate and damage the property." Sweet Lake alleged that "[e]ach defendant is obligated by the mineral leases, surface leases, other contracts and law to restore the Property and has breached that obligation." Sweet Lake asserted that Oleum breached its obligation under the 2003 Settlement Agreement to "restore promptly the surface of the property" and that AKSM breached its obligations under the 2008 Lease to abandon the existing oil facility, to remove all contaminated soil thereon, and to conduct a site assessment.

_____

*of same as provided in Subparagraph 16(i) hereof and to provide a written copy of the site assessment to LESSOR by October 31, 2018 all at LESSEE's sole cost, risk and expense*. LESSEE agrees to complete said abandonment not later than September 30, 2008 and agrees to give LESSOR 30 days' notice prior to commencement of said abandonment. LESSOR hereby consents to LESSEE's construction of a tank battery and related facilities at the location currently delineated near the C-9 location of the east side of Section 34.

(Emphasis added.)

Along with its contractual claims, Sweet Lake alleged that the defendants "negligently, recklessly or intentionally stored and disposed of the substances in pits located on or adjacent to the Property[,]" and that they knew or should have known that the practice would result in seepage and cause soil and water contamination. Sweet Lake also maintained that the defendants negligently or intentionally released substances on the property, purportedly resulting in contamination and migration of some or all the substances. Identifying "[s]ome or all of the substances" as bio-available and susceptible of uptake by humans, animals, and plants, Sweet Lake alleged that the defendants acted with wanton or reckless disregard of public safety by "intentionally, recklessly or negligently" storing, handling, transporting, or disposing of "hazardous or toxic substances" on the property.

Sweet Lake explained that it uses the property for cattle grazing, hunting, and farming and alleged that the defendants' conduct interferes with the use and enjoyment of the property and has diminished its value. Seeking damages, Sweet Lake claims:

> As a result of defendants' breach of contract, tortious conduct and violations of law, including but not limited to statewide order 29-B, plaintiff has sustained damages in the amount of (a) the cost to evaluate and clean up the Property and to protect human health and environment, (b) diminution in the value of the Property including the stigma associated with property even after it has been cleaned up, (c) lost revenues, (d) exposure to potential liability to the government, neighbors, and others and (e) other losses and damages.

Sweet Lake further asked for penalties, punitive damages, attorney fees, and costs.

The suit reached trial in 2015. By that time, only BP, Oleum, and AKSM remained as substantive defendants.[6] Over a two-week period, the parties presented the jury with fact and expert testimony regarding BP's forty-year presence on the

---

[6] Flash also remained as a nominal defendant but did not make an appearance at trial.

5

property, BP's use and closure of the clay pits in its operations, and Oleum/AKSM's assumption of obligations to restore the property formerly occupied by BP. Much of the testimony and expert evaluation focused on the level of required remediation. Figures offered by experts for Sweet Lake and BP varied greatly with Sweet Lake offering remediation contingency estimates of up to $32 million dollars and BP offering a remediation estimate of $1.4 million dollars.

The jury was presented with a verdict sheet inquiring whether "environmental damage exists on Sweet Lake's property" and, if so, which party was "responsible" therefor. That specific inquiry reflects the requirements for referral for the regulatory remediation process of La.R.S. 30:29,[7] as discussed further below. The verdict sheet additionally inquired as to the plaintiffs' private causes of action sounding in tort and contract.

In response to the questions regarding regulatory remediation under La.R.S. 30:29, the jury found "environmental damage" on Sweet Lake's property and designated "Sohio Petroleum Co./BP" as the sole operator "responsible" for that damage. The jury assessed the "cost to clean up Sweet Lake's property" at $1.5 million dollars, a figure only marginally higher than BP's remediation estimate.

The jury rejected Sweet Lake's claims as to whether the operators: 1) were "strictly liable for damages"; 2) "unreasonably or excessively" used the property; or 3) were negligent. The jury also rejected Sweet Lake's breach of contract claims as to BP, Oleum, and AKSM.

By its September 11, 2015 judgment, the trial court commemorated the jury's finding that BP was "responsible for environmental damage" on the Sweet Lake

---

[7] As previously indicated, the parties and jurisprudence at times refer to La.R.S. 30:29 as Act 312 in keeping with common parlance. This opinion uses "Act 312" only as quoted.

property. In keeping with the requirements of La.R.S. 30:29, the trial court further ordered BP to submit a plan to remediate the property to LDNR within 60 days. The trial court ordered that: "The plan shall remediate to applicable regulatory standards the contamination that resulted in the environmental damage to the Property." The trial court allowed Sweet Lake an additional 60 days from its receipt of BP's submittal to provide LDNR and the court with its own remediation plan and comment in response.

The September 11, 2015 judgment further reflected the jury's rejection of Sweet Lake's private causes of action, dismissing its claims against "AKSM, L.C., Oleum Operating Company, and Flash Oil and Gas Northeast, Inc." with prejudice. The judgment further dismissed "Sweet Lake's claims for money damages against BP[.]" It assessed BP with all court costs and permitted Sweet Lake to "submit a motion to assess the other fees and costs, *e.g.*, attorney's fees and costs and expert fees and costs, pursuant to La.[R.S.] 30:29.E.1."

After the trial court denied Sweet Lake's motion for JNOV or alternative motion for new trial with regard to Oleum and AKSM's responsibility for damages, Sweet Lake appealed from the partial final judgment dismissing the contract claims as to Oleum and AKSM.

The panel considering Sweet Lake's initial partial appeal as to Oleum and AKSM concluded that the jury erred in rejecting the breach of contract claims against Oleum and AKSM. *Sweet Lake Land & Oil Co., LLC v. Oleum Operating Co., L.C.*, 16-429 (La.App. 3 Cir. 3/8/17), _ So.3d _,[8] *writ denied*, 17-1107 (La. 10/27/17), 228 So.3d 1224. (*Sweet Lake I*). Notwithstanding the origin of the

---

[8] 2017 WL 914767.

contamination on the property, Oleum acknowledged that it assumed a restoration obligation by the 2003 Amendment to the 1947 Lease.[9] A portion of that obligation required restoration of the area around the C-3 Well. Expert testimony demonstrated the existence of contamination in that area. While the parties disputed the degree of contamination, its existence was nonetheless established as was the fact that Oleum failed to remediate that area in keeping with its obligation under the 2003 Amendment to its lease. AKSM also assumed a restoration obligation by the 2008 Lease as it agreed to "remove any contaminated soil and transport same for disposal" from the historic "Existing Oil Facility."[10] Expert testimony was "conclusive that the area around the Existing Oil Facility was contaminated." *Id*. at _. The panel accordingly determined that, like Oleum, AKSM breached its contract. *Id.*

Although the *Sweet Lake I* panel concluded that the record required a finding that Oleum and AKSM were in breach of contract, the panel found the record fell "woefully short of establishing with any measure of reasonable certainty the amount of damages required to remediate" the areas surrounding the C-3 Well and the Existing Oil Facility. *Id.* at _. The panel thus remanded the matter for the trial court's determination of damages due on the contractual claims. *Id.* On remand, the trial court conducted a bench trial on the damages issue, finding Oleum and AKSM liable for damages in the amount of $12,921,124.00.[11]

---

[9] The panel specifically pointed to the 2003 Amendment's provision that "[w]ithin 6 months of determining that any well among the Nos. C-2, C-3, C-7, C-8, or C-9 Wells have no future utility, Lessee [Oleum] shall plug and abandon the well and restore the surface area around the well to the requirements of Title 43, Statewide Order No. 29-B."

[10] The panel explained that "[t]estimony established the Existing Oil Facility was in an area located near the salt water disposal wells that had been used by BP and other operators to store hydrocarbons and processed water." *Id.* at _.

[11] Although the trial court conducted the bench trial in December 2019, it included the award in the July 28, 2020 judgment now under review. Neither Oleum nor AKSM appealed from that aspect of the judgment however and it is not at issue in this proceeding. The record under

8

While Oleum and AKSM's liability was resolved via *Sweet Lake I* and the second trial, Sweet Lake and BP addressed the pending order for remediation pursuant to La.R.S. 30:29, before LDNR. In October 2016, LDNR issued its "Most Feasible Plan[12] and Written Reasons in Support as Required by La.R.S. 30:29." LDNR estimated the cost of implementation at $881,593.45. BP moved to adopt the plan as submitted, requesting that the estimated costs be deposited into the registry of the court for the court's continued jurisdiction and oversight of the remediation. Sweet Lake opposed the motion, arguing to the trial court that the plan was not a final one as it did not adequately address the evaluation and cleaning of the property.

Following a hearing, the trial court denied BP's motion for adoption of the original LDNR plan, finding ambiguity in LDNR's final report, noting that LDNR had been limited by a lack of information that remained to be developed at the time

consideration does not include a transcript or documentation from the bench trial as to Sweet Lake's claims against Oleum and AKSM.

[12] The Louisiana Administrative Code provides pertinent definitions as follows:

*Environmental* Damage - actual or potential impact, damage, or injury to environmental media caused by contamination resulting from activities associated with oilfield sites or exploration and production sites.

. . . .

*Feasible Plan* - the most reasonable plan which addresses environmental damage in conformity with the requirement of Louisiana Constitution Article IX, Section 1 to protect the environment, public health, safety and welfare, and is in compliance with the specific relevant and applicable standards and regulations promulgated by a state agency in accordance with the Administrative Procedure Act in effect at the time of clean-up to remediate contamination resulting from oilfield or exploration and production operations or waste.

LA. ADMIN. CODE tit. 43, Pt. XIX § 603. It further provides that "*Contamination*" is "the introduction of substances or contaminants into a groundwater aquifer, a USDW or soil in such quantities as to render them unusable for their intended purposes." LA. ADMIN. CODE tit. 43, Pt. XIX § 301.

of its consideration of the matter.[13]  By its May 9, 2017 judgment, the trial court

ordered that:

> [T]he Department of Natural Resources, Office of Conservation (the
> "LDNR") submit a final plan to the Court that includes a remediation
> plan for all environmental damage that needs to be remediated.
> LDNR's Plan is not complete with regard to groundwater remediation,
> removal of flow lines and other matters.  The plan shall:
>
> a.    Address groundwater remediation on the property owned by
>       Sweet Lake, in Section 34, Township 10 South, Range 6 West,
>       Calcasieu Parish, Louisiana (the "Property").    The final
>       remediation plan may contain clean up options that depend upon
>       the results of additional information and should be accompanied
>       by an estimate of the cost to obtain the additional information.  If
>       LDNR is unable to provide the foregoing final remediation plan,
>       it shall provide the Court with information to help the Court
>       better order LDNR to do what needs to be done;
>
> b.    Specify the regulation or standard for each clean up activity so
>       that the Court can enforce it;
>
> c.    Specify the flowlines on the property and include a remediation
>       plan for flowlines that must be removed; and

---

[13] In so ruling, the trial court explained at the hearing, in part, that:

I don't say this to criticize the LDNR.  I simply say this to say that what I am
expecting or what I expected was something very well done like this report, but I
think it's lacking as far as its completeness with regard to certain aspects.  I guess
namely the groundwater plan and then the flowline plan.

 . . . I need to know what the plan is.  And I don't want to end up finding out later
that there's something else that LDNR has decided that's different from what I
believe they represented to be in this plan.  And that's just one example with the
flowlines.

        . . . .

        And so I don't think that - - I don't find that … this plan is complete.  I don't
know if it's the most feasible one or not to remediate the - - because they haven't
submitted a plan for me to look at for the - - for at least part of this, for the
groundwater and the flowlines, et cetera.

        And so what I'm going to do is I'm going to order that within 60 days the
LDNR to submit a final plan to this Court that includes a remediation plan for all
aspects of this project that needs to be remediated, all aspects of the area of the - -
that has environmental damage that needs to be remediated.

d. State whether a response or comment was received from any other agency to whom the October 3, 2016 LDNR plan was submitted pursuant to La. R.S. 30:29(3)(b)(i) and (ii).

BP filed a writ application from the May 9, 2017 judgment, seeking consideration of the *res nova* issue of whether La.R.S. 30:29 granted the trial court the authority to reject LDNR's feasible plan and to order the agency to re-submit its final remediation plan. A panel of the court denied the writ by published opinion, finding that the trial court acted within its authority. *See Sweet Lake Land & Oil Co. v. Oleum Operating Co., L.C.*, 17-464 (La.App. 3 Cir. 10/18/17), 229 So.3d 993 (*Sweet Lake II*).

Pertinent to the appeal under consideration, the May 9, 2017 judgment also addressed the parties' conflicting views of the attorney fees and costs available to Sweet Lake under La.R.S. 30:29(E). While Sweet Lake sought recovery of its fees and costs associated with the entirety of the litigation against all defendants, BP countered that La.R.S. 30:29 limited its recovery to those claims on which it was successful, *i.e.*, the remediation proceedings before LDNR. Following a hearing, the trial court granted, in part, Sweet Lake's Motion and Order to Assess Fees and Costs against BP, stating:

> With BP's stipulation that it does not contest the reasonableness of the attorney's fees and expert fees, the Court finds that the fees and costs were reasonable and rules that Sweet Lake *is entitled to recover all of the fees and costs submitted with the Motion to Assess Fees and Costs pursuant to La.[R.S] 30:29*. BP's arguments that some fees and costs are not recoverable under La.[R.S.] 30:29, or should be reduced based upon the ultimate result obtained in this case, are rejected."

(Emphasis added.)

Given its pending order for the submission of a final remediation plan, the trial court deferred a final award of fees and costs "to the hearing on the adoption of the final plan … after additional work is completed on this case."

11

The record shows that LDNR informed the trial court of its response to the May 9, 2017 judgment, including LDNR's issuance of a Compliance Order to BP for further evaluation and delineation of specified contamination, for further investigation of groundwater quality, and for an associated work plan. In October 2018, LDNR approved a Work Plan developed by BP's expert, Hydro-Environmental Technology (HET), for submission of data findings from the necessary delineation and testing activities required by the Compliance Order. The Work Plan included a timeline for activities on the property with a projected deadline of September 2019.

In April 2019, well before the projected deadline, Sweet Lake filed a Motion to Set Deadlines for Most Feasible Plan asserting that "BP has not provided LDNR the information necessary to formulate the feasible plan[,]" and that "LDNR has not imposed deadlines on BP to provide LNDR with the needed information." BP opposed the motion and noted that Sweet Lake did not object to the September 2019 deadline included in the October 2018 Work Plan. It referred to its efforts in addressing LDNR's Compliance Order and in performing pursuant to the October 18 work plan, stating that its expert, HET, had "acted when it could act," receiving oversight and guidance from LDNR as needed. BP further stated that it was only "forced to delay completion of the necessary work in order to obtain the necessary approval of that work from the U.S. Corps of Engineers."

Despite the apparent conflict, the parties reached a stipulation at the hearing on the motion to set deadlines in August 2019. The trial court entered a September 24, 2019 judgment reflecting that stipulation and setting deadlines for work on the property. The judgment included an order that BP would submit a written report on the first of every month to the trial court describing the status of its work performed

under the schedule. The trial court provided Sweet Lake a corresponding period for its comment or for submission of its own written report.

BP's work status report for October 2019, along with Sweet Lake's report in response, reflected that the permitting process before the Corps of Engineers was ongoing and that the parties differed as to whether that lack of a final permit prohibited BP from proceeding with work immediately. By the time of BP's Supplemental November 5, 2019 report, however, the Corps of Engineers had approved HET's submitted work proposal and issued the subject permit. BP informed the trial court that HET began immediate sampling of the groundwater monitoring wells on the site and that it would begin further soil and groundwater assessment and pit remediation work the following week.

Later in November 2019, BP filed a Motion for Approval of Proposed Work and explained that during its work under the October 2018 Work Plan, HET discovered an area of phase-separated hydrocarbons (PSH) at one of its monitoring wells on the property.[14] BP therefore submitted a proposed soil remediation plan (the Area 1 Plan) for that area to LDNR and Sweet Lake in order to remove PSH "as an interim corrective action, while HET work[ed] to complete other aspects of the approved plan, including the delineation assessment and aquifer classification."

Sweet Lake objected to BP's request and argued that BP was attempting to circumvent the requirements of La.R.S. 30:29. Sweet Lake explained that since the PSH was only recently discovered during HET's investigation of the site, BP's

---

[14] BP explained in its motion that phase-separated hydrocarbons (PSH) is "oil present as a discrete substance rather than mixed with water and soil."

13

proposed remediation of Area 1 had not been approved by LDNR,[15] nor had it been adopted by the trial court as part of a final feasible plan. Sweet Lake maintained that the lack of progress deprived it of the opportunity to address the discovery of the PSH, or the proposed remediation thereof with either LDNR or the trial court. Sweet Lake additionally observed that BP did not propose to place the funds for the Area 1 Plan in the registry of the court as required by La.R.S. 30:29. The trial court set the motion for approval of proposed work for a June 2020 hearing.

BP continued to file monthly reports regarding its performance of sampling and testing activities, some of which were completed. These activities did not involve the contested work proposed as part of the Area 1 Plan. By the time of the May 2020 report, however, and through the last report filed into the record in August 2020, certain aquifer testing remained uncompleted. As reasons for the delay, BP cited ongoing weather-related conditions at the site as well as the necessity of LDNR intervention in the testing proposal due to concerns Sweet Lake lodged with the department.

Given this ongoing activity in furtherance of LDNR's 2017 Compliance Order and the 2018 Work Plan, Sweet Lake continued to accrue fees and costs associated with the proceedings during that expanse of time. As noted above, by its May 9, 2017 judgment, the trial court determined that Sweet Lake was entitled to an award of fees and costs in full, but deferred a final judgment in that regard "to the hearing on the adoption of the final plan … after additional work is completed on the case." Three years later, in April 2020, Sweet Lake filed a "Motion to Assess Additional

---

[15] Sweet Lake questioned BP's representation that LDNR had approved of its "Area 1 Work Plan." It instead asserted that LDNR merely indicated by email that it did not object to the remediation plan.

14

Fees and Costs Against BP[,]" and stated that at the time of the May 9, 2017 judgment, it had anticipated that a final feasible plan would be adopted **by the end of 2017**. Sweet Lake explained that at the time of the initial hearing on attorney fees, it had incurred $4,372.392.95 in fees and costs, but that the sum had grown to a total of $5,261.932.30 in the interim. Citing the passage of three years since the May 9, 2017 judgment, Sweet Lake requested that the trial court issue "a final judgment for its fees and costs because there is literally no end in sight as to when LDNR will submit a revised plan to the Court." BP argued in opposition that any award of fees and costs would be premature until the trial court approved a final feasible plan.

The trial court considered the motion to assess additional fees in June 2020, rendering an oral ruling. As seen in his reasons set forth below, the trial court recognized the lengthy period that the regulatory matter had been proceeding before LDNR—now several years—and entered a partial final judgment on fees and costs at the time of its ruling. The trial court determined that the documentation of fees and costs was reasonable and explained that it would award Sweet Lake's attorney fees, expert fees, and costs to date in their entirety as requested.

The resulting July 28, 2020 judgment was cast, in part, as a final judgment to the extent it reflected the trial court's award of $12,921,124.00 against Oleum and AKSM for breach of contract, and to the extent these two defendants were cast in judgment for fees and costs. That aspect of the judgment has not been appealed and is now final.

In its July 28, 2020 judgment, the trial court also entered the partial final judgment now under review against BP and awarded a total of $5,330,479.72 in "attorney fees, expert fees and costs" in favor of Sweet Lake; a figure comprised of

15

$3,201,824.39 in attorney fees and costs and $2,128,654.72 in expert fees and costs. The trial court cast BP, Oleum, and AKSM liable *in solido* for these amounts.

The judgment further reflected the plaintiff's right to seek additional fees and costs associated with LDNR's ongoing effort to produce a final plan of remediation. As urged by Sweet Lake, the judgment fashioned the relief granted in favor of Sweet Lake and against BP as "a partial final judgment because there is no just reason for delay of the Court's ruling that BP is responsible for environmental damage and liable, *in solido* with AKSM, L.C. and Oleum Operating Company, L.C., for Sweet Lake's attorney's fees, expert fees, and costs."

BP filed a timely suspensive appeal of the July 28, 2020 judgment.

## ASSIGNMENTS OF ERROR AND ANSWER TO THE APPEAL

In its appellant's brief, BP includes the following assignments of error:

1. The Trial Court erred in designating the July 28, 2020 [judgment] as a partial final judgment with regard to the finding of environmental damage as to BP and the assessment of fees and costs pursuant to La.R.S. 30:29.

2. The Trial Court erred in implementing the post-trial procedures established by La.R.S. 30:29 – establishment of a most feasible plan and awarding attorney's fees – when the jury found BP not liable to Sweet Lake **under any theory of liability**.

3. The Trial Court erred in awarding attorney's fees and costs to Sweet Lake in excess of the amount of such fees and costs allowed under La.R.S. 30:29.

4. The Trial Court erred in finding that BP was solidarily liable with Oleum and AKSM for attorney's fees and costs under La.R.S. 30:29.

5. The Trial Court erred in overruling BP's exception of prescription.

6. The Trial Court erred in overruling BP's exception of *res judicata*.

(Emphasis added.)

Sweet Lake filed an Answer to the appeal, asserting that:

1.     The jury manifestly erred in finding that BP had not breached the mineral lease by negligence or excessive or unreasonable use.

By its Answer, Sweet Lake further requests attorney fees for work performed on appeal.

BP responded to Sweet Lake's Answer, filing a Motion to Dismiss Answer to Appeal and suggesting a lack of jurisdiction for its consideration.

We address the parties' submissions in turn.

## DISCUSSION

### BP Assignment of Error Number One

*Partial Final Judgment*

Although it appears as the appellant in this case, BP asserts that the trial court improperly certified the July 28, 2020 judgment on attorney fees and costs as a partial final judgment suitable for appeal pursuant to La.Code Civ.P. art. 1915(B). BP contends that the judgment reflects a "picking and choosing" of certain issues for appeal while leaving others to be addressed by a final judgment and likely appeal at a later time. BP particularly points to the dismissal of Sweet Lake's claim for private causes of action against BP as a remaining issue not yet reduced to a final, appealable judgment.[16]

Louisiana Code of Civil Procedure Article 1915(B)(1) (emphasis added) provides, in pertinent part, that "[w]hen a court renders a partial judgment … as to one or more but less than all of the claims, demands, issues, or theories against a party … the judgment shall not constitute a final judgment unless it is designated as

---

[16] BP also makes this argument in its Motion to Dismiss Answer to Appeal wherein it challenges Sweet Lake's ability to seek review of the dismissal of its tort and contract claims by an answer in this restricted appeal.

17

a final judgment by the court *after an express determination that there is no just reason for delay*."

In 2005, the supreme court issued *R.J. Messinger, Inc. v. Rosenblum*, 04-1664, p. 4 (La. 3/2/05), 894 So.2d 1113, 1117 in order to address the "limited procedural issue" of whether the "express determination that there is no just reason for delay" as required by La.Code Civ.P. art. 1915(B)(1) "requires the trial court to give specific reasons for designating a partial judgment as final[.]" The supreme court resolved that issue, which arrived before it following a split among the circuits, and held that a "trial court should give explicit reasons, either oral or written, for its determination that there is no just reason for delay" in order to assist an appellate court's review of designated partial final judgments. *Id.* In the event the trial court provides such explicit reasons, an appellate court considers whether the trial court abused its discretion in the designation. *Id.* If no reasons are given, but justification for the trial court's ruling is apparent on the record, an appellate court considers the designation following a *de novo* review.

The supreme court listed the following non-exclusive factors that the court *may* consider in determining whether a judgment should be designated as appealable pursuant to La.Code Civ.P. art. 1915(B)(1) as follows:

1)  The relationship between the adjudicated and unadjudicated claims;

2)  The possibility that the need for review might or might not be mooted by future developments in the trial court;

3)  The possibility that the reviewing court might be obliged to consider the same issue a second time; and

4)  Miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*R.J. Messinger*, 894 So.2d at 1122 (citing *Allis-Chalmers Corp. v. Philadelphia Elec. Co.*, 521 F.2d 360, 364 (3d Cir. 1975). The supreme court explained, however, that "the overriding inquiry for the trial court is whether there is no just reason for delay." *Id.* at 1122-23.

Challenging the trial court's designation of the partial final judgment in this case, BP contends that the appeal should be dismissed because the trial court allegedly "*ignored*" the *Messinger* factors and that any *de novo* review of the *Messinger* factors by this court would similarly result in a dismissal due to the certainty of future litigation in this matter. BP does not acknowledge that the supreme court provided the *Messinger* factors as ones that a trial court "may"[17] consider and that it further described them as non-exclusive.

The trial court did, in fact, render explicit oral reasons for its designation of its ruling as a partial final judgment, as it explained that:

> [W]ith regard to the attorney fees, expert witness fees and costs … I've reviewed the costs as they requested and the fees, as well as the … memos and the affidavits and the testimony last week, as well as the arguments … I think they're all reasonable.
>
> This is very, very difficult litigation, very time consuming, very expensive, very expert intensive, time intensive; and under the circumstances for this type of litigation, I find that it's all - - all of the costs and fees are reasonable. I think all of the factors that were set forth and discussed last week, I think are met. And as discussed on the record last week, I think that those fees are - - well, by the way, you know, I'm going to say that - - even though I said that last time or three years ago that I wanted to wait until we had a final plan developed. I thought it would be by the end of the year or whatever. I think that was like in May that we had that hearing. I assumed that it would be by the end of the year that we would have the final plan.

---

[17] BP states in its brief that the supreme court provided the factors as ones that trial courts "should" consider. The supreme court instead held that its non-exclusive factors "*may* be used by trial judges when considering whether a partial judgment should be certified as appealable[.]" *R.J. Messinger*, 894 So.2d at 1122 (emphasis added).

I never dreamed it would be three years later … that the Plaintiff in this case would be out all of those expenses and all of those fees. That is a long time to be out of all of those expenses. So that was my original plan was to try to wrap all of that stuff up together. But it's not - - it's not - - it was never my intention to have this be put off for years before addressing this issue and so - - because it has the potential, heaven forbid, to go on for another year or two or three. I pray that it doesn't happen[]. I hope we get it resolved this year. I have no idea when it is going to get resolved at this point. So - - and it can always be, you know, there can always be some supplemental request later to address any additional fees and costs that are necessary as we go; but I think we can do a final judgment that includes all of the fees and costs up to this point. I think the law contemplates that; and something like this shouldn't just hold everybody up, especially with the amount of costs and fees in this case; that years and years and years have gone by without anything being paid.

While the trial court did not specifically articulate and discuss each of the "*Messinger* factors" separately, the trial court clearly complied with the supreme court's direction in that case. Far from "ignoring" those considerations as suggested by BP, the trial court instead focused on the overriding inquiry of whether it found just reason for delay. It pointedly recognized the unforeseen three-year-time lapse between the initial May 2017 hearing at which it found Sweet Lake entitled to recover all fees and costs pursuant to La.R.S. 30:29, and the June 19, 2020 hearing on the fees and costs issue. Given that grossly excessive period of time, as well as the trial court's recognition of the sizeable fees and costs already incurred by Sweet Lake, it can hardly be said that the trial court abused its discretion in its designation of the partial judgment as final. Rather, the trial court's focus on the unique and protracted nature of the underlying litigation corresponds with the supreme court's description of the *Messinger* factors as non-exclusive and supports its reasons for designation of its partial judgment on the fees and costs issue herein as final.

Moreover, BP's analysis of the *Messinger* factors is in conflict with the facts of this case. It contends that "the adjudicated and unadjudicated claims in this matter

are so closely interrelated that it is all but inevitable that this Court will be presented with one or more subsequent appeals that will require it to address issues identical to those presented here." That analysis is incorrect. The trial court awarded partial attorney fees and costs to date pursuant to the specific authority of La.R.S. 30:29. The judgment does, in fact, reserve Sweet Lake's right to pursue "*additional* attorneys' fees, expert fees and costs incurred *hereafter* in connection with this case or the proceedings before the Louisiana Department of Natural Resources to develop a final plan of remediation." (Emphasis added.) However, consideration of the referral itself, and the question of the right to the actual availability of fees and costs at issue herein are unlikely to return to this reviewing court absent review and remand by the supreme court.

Neither is *Messinger* factor two implicated here, as there is little possibility that the present review might be mooted by *future developments in the trial court*. BP suggests that Sweet Lake's continued claim to private causes of action could affect the fees and costs that are the subject of this appeal. Again, however, the judgment reflects that all fees and costs, as awarded by this judgment, were under the authority of La.R.S. 30:29 and were awarded as of the date of the hearing.

Finally, in its briefing of the fourth *Messinger* factor—which addresses miscellaneous issues such as judicial economy, solvency of the parties, frivolity of competing claims, and expense—BP suggests that the trial court should have considered "the unnecessary expense to the parties of a premature appeal, judicial efficiency, and the judicial policy against multiple appeals and piecemeal litigation[.]" Certainly *Messinger*, 894 So.2d at 1122 recognizes that "Article 1915 … attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the

21

parties." Dismissal of the present appeal would not, in any way, further the recognized benefit of permitting review, and perhaps finality, of the discrete issues raised herein. Rather, this matter has already spurred multiple reviews of both interlocutory and final judgments and arrives at this court with 62 volumes of record, several supplements, and 178 volumes of exhibits.

Accordingly, we find no merit in BP's arguments on the partial final judgment designation.

## BP Assignment of Error Number 2

*Louisiana Revised Statutes 30:29* (Act 312)

BP's foundational argument on appeal, raised by its second assignment of error, addresses the jury's determination that it is the sole party "responsible" for the contamination on the Sweet Lake site while making a corresponding determination that Sweet Lake failed to prove the private causes of action in tort and contract. BP observes that based upon the finding of "responsibility," the trial court ordered the matter referred to LDNR for development of a remediation plan and, in turn, awarded fees and costs. BP contends, however, that the trial court erred in implementing either post-trial measure given the jury's finding that Sweet Lake failed to prove private liability.

BP notes that the procedure of La.R.S. 30:29 provides, in pertinent part:

C. (1) If at any time during the proceeding *a party admits liability for environmental damage or the finder of fact determines that environmental damage exists and determines the party or parties who caused the damage or who are otherwise legally responsible therefor*, the court shall order the party or parties who admit responsibility or whom the court finds legally responsible for the damage to develop a plan or submittal for the evaluation or remediation to applicable regulatory standards of the contamination that resulted in the environmental damage. The court shall order that the plan be developed and submitted to the department and the court within a time that the court determines is reasonable and shall allow the plaintiff or any other

party at least thirty days from the date each plan or submittal was made to the department and the court to review the plan or submittal and provide to the department and the court a plan, comment, or input in response thereto. The department shall consider any plan, comment, or response provided timely by any party. The department shall submit to the court a schedule of estimated costs for review of the plans or submittals of the parties by the department and the court shall require the party admitting responsibility or the party found legally responsible by the court to deposit in the registry of the court sufficient funds to pay the cost of the department's review of the plans or submittals. Any plan or submittal shall include an estimation of cost to implement the plan.

(Emphasis added.) BP thus maintains that a trial judge shall order LDNR's development of a most feasible remediation plan and, in turn, impose related fees and costs,[18] only after either: 1) a party's admission of liability for environmental damage; or 2) the factfinder's determination that environmental damage exists and that a particular party/parties caused and or is otherwise legally responsible therefor.

BP points out that La.R.S. 30:29(C) does not include a definition of "legal responsibility," but contends that "caselaw makes clear that legal responsibility only lies if there is an independent basis for private liability outside" of La.R.S. 30:29. *Citing Tensas Poppadoc, Inc. v. Chevron USA, Inc.*, 08-1266 (La. 5/6/09), 10 So.3d 1259, *writ denied*, 09-1265 (La. 9/18/09), 17 So.3d 976; *Wagoner v. Chevron USA, Inc.*, 45,507 (La.App. 2 Cir. 8/18/10), 55 So.3d 12, *writ denied*, 10-2773 (La. 3/2/12), 83 So.3d 1032. It contrasts that jurisprudence with other cases in which a jury found underlying private causes of action and, in turn, the regulatory procedure was triggered. BP contends that these latter cases demonstrate the proper working of the post-trial procedures under La.R.S. 30:29. *Citing Savoie v. Richard*, 13-1370 (La.App. 3 Cir. 4/2/14), 137 So.3d 78, *writs denied*, 14-1283, 14-1287 (La. 11/14/14), 152 So.3d 880; *State v. La. Land & Expl. Co.*, 19-248 (La.App. 3 Cir.

---

[18] An award of fees and costs pursuant to La.R.S. 30:29(E)(1) will be discussed in more detail in the discussion of BP's assignment regarding that award.

23

5/6/20), 298 So.3d 296. BP further points out that the supreme court decision in *State v. La. Land & Expl. Co*., 12-884 (La. 1/13/13), 100 So.3d 1038 (*La. Land & Expl. I*) indicates that La.R.S. 30:29 is merely procedural, does not provide an independent cause of action, and merely addresses the method by which the remedy is implemented.

BP's argument fails in two respects. As BP acknowledges, the first avenue for a trial court's referral to LDNR for a final remediation plan is a party's admission of responsibility for environmental damage. Review of the transcript indicates that BP made judicial admissions as to both environmental damage and BP's responsibility for the La.R.S. 30:29 remediation procedure.

Louisiana Civil Code Article 1853 defines a "[j]udicial confession" as "a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it." Such a confession must be explicit and cannot be implied. *Yesterdays of Lake Charles, Inc. v. Calcasieu Par. Sales & Use Tax Dep't*, 15-1676 (La. 5/13/16), 190 So.3d 710. Pertinent to this case, counsel's declaration has the same effect as if made by the party itself. *See C.T. Traina, Inc. v. Sunshine Plaza, Inc.*, 03-1003 (La. 12/3/03), 861 So.2d 156.

Although BP contests such a judicial confession, BP's counsel made patent admissions of responsibility for the regulatory cleanup in both opening and closing argument, seemingly explaining to the jury that BP's participation in the procedural remedy of La.R.S. 30:29 was an inevitability if not already ongoing.[19] Although BP disagreed with Sweet Lake's estimate as to the extent of the environmental damage and the remediation required, counsel nonetheless recognized BP's responsibility to

---

[19] *See, e.g.*, Record Volume. 50, p. 12375, pp. 12383-87, pp. 12396-97; Record Volume 61, p. 15112; pp. 15118-15121, pp. 15151-15153.

24

provide the regulatory response due to the presence of at least a degree of environmental damage. Following much debate as to whether counsel would be able to inform the jury regarding its initial submission of a "plan" to LDNR, counsel for BP stated in opening argument that:

> You're going to hear lots of evidence, but the bottom line is this is about doing the responsible thing. It's about doing what is reasonable over what is exaggerated, what is not harmful compared to something that is not only harmful but destructive. You're going to see very different approaches to how this matter should be solved, how this problem should be solved.
>
> Sohio and BP are not here to say we're not willing to do anything out here as the plaintiffs would have you believe. What we're willing to do is exactly what they suggest, *which is they're entitled by the contract they have and the law that applies that they're entitled to a regulatory cleanup, a regulatory remediation plan that puts this particular piece of property back into compliance with whatever the regulation is and, by the way, that's regardless of who may have caused any of the problems that they claim to exist.* We completely disagree on the nature of what is out there, that is a fact.
>
> We talked about regulations in our voir dire. We discussed the fact that regulations are necessary, regulations are proper. There needs to be some kind of control over what's going on in several industries, not just the oil and gas industry, but obviously that's what we're talking about here today. That's what those regulations are for. Plaintiffs would like to pick and choose the regulations they would like to use and do not want to use the ones that they think are not going to allow them to put an incredibly huge number on a board and say give me 75 or $74,000,000. That's what this is about. You're going to see all the evidence. You're going to be - - as many people, all of you, we want to see the evidence. We want to make a determination based upon what that is about. Well, that is what I would like for you to do. When you see this evidence, when you hear the evidence, when you look at the documents then you get to decide which is more responsible, *which is more reasonable, which complies with the regulations*, whose experts know exactly what should be done and who does not know what should be done.

I think you're going to see Sohio and BP are committed to doing the response [sic] thing. That is what they would like to do. They want to make sure that this property is fixed to where there's no harm to human health involved, no harm to the environment involved, and specifically this property can be used for exactly the same purpose it could've been used had there never been an oil and gas well ever on this property. *That's what we believe the contract says they're entitled to and the law says they're entitled to and that is what they will get if they allow the plan to go on as opposed to their plan*[.]

(Emphasis added.)

BP's counsel further cited the parties' differences in approach in contrast to areas of agreement, explaining:  "There are a couple of things we do agree on. There's some things that need to be addressed, that need to be improved, *and that is something that we certainly can do and will do.*  That is what hopefully both sides can agree upon.  That's where the agreement ends."  (Emphasis added.)  Counsel reminded the jury of the series of operators working the Sweet Lake property and discussed the course of litigation before returning to BP's commitment to the regulatory procedure, explaining:

But what happened after this was filed?  After this was filed - - these cases take on a life of their own.  I asked you about a legacy suit and this is a legacy suit and they have a schedule they go by.  Plaintiffs go out and they do testing and operating and you'll see something about that in a moment, but they do all the testing and sampling and they come up with what they think is wrong with the property and their plan to take care of it and then the defendants, BP, Oleum, and everybody goes out and now mind you all the other people were involved in this litigation originally.  *So now we've got BP and Oleum and they come up with a plan based upon this lawsuit that has been filed that they think will address all of the issues, a regulatory cleanup to which these people are entitled.*

(Emphasis added.)[20]

---

[20] Counsel for Oleum similarly referenced pre-trial attempts to reach an agreement to remediate, both in questioning of a witness and in closing argument.  *Sweet Lake I*, _ So.3d _ referenced Oleum's discussion within the context of a violation of a motion in limine entered in favor of Sweet Lake.  We do not return to that discussion here.

BP again acknowledged "impact" on the property in its closing argument with counsel referencing its own expert's testimony regarding the measure of required remediation and the nature of the obligations imposed by the 1947 Lease. Counsel stated that:

> When we discussed the contract initially we talked about normal wear and tear. We talked about expected impact. We talked about the fact that prudent operations are not perfect operations, and they're not.
>
> We'll tell you, there is impact on this property; we don't deny that. Occasionally, things went wrong; we don't deny that. The parties to that lease expected things to go wrong, not out of control, things would happen.
>
> The issue is always, always, what do you do when things go wrong. Now, so many things go wrong that it's no longer excusable, that's a problem. That didn't happen here.

Counsel maintained its position regarding the reasonableness of BP's operations in the field and the *extent* of its responsibility but nonetheless conceded environmental damage by referencing the "impact" to the property as follows:

> That goes back to my issue about normal impact. There is impact from oil and gas operations, there's impact. There is no question about that. But where the impact is known, where the impact is accepted, acted on, then I think you can take - - you can definitely take that into account, interpreting what the parties expected when they did the lease and what they deemed to be normal wear and tear.
>
> . . . .
>
> There is impact, there's no question there's impact. And the reason I focus your attention on this is because this goes to this notion that Sohio knew these pits would leak. That's absurd, that's absurd.
>
> . . . .
>
> Now, what the evidence shows. BP had the right to do what it did under the contract. There was no breach of contract. The parties expected impact. *The impact that you see today is reasonable impact; just normal wear and tear. BP has proposed a plan to deal with it.*

Counsel suggested that Sweet Lake pursued litigation rather than contact BP and

work within the regulatory confines to seek redress and stated:

> Mr. Vickers[21] was up there, said, what do you do when a landowner contacts you? We sit down with them, we try to work it out, go to LDNR and make sure there is an appropriate plan and then we address it.

> That's the way to do it. A suit is not necessary to accomplish this. So why wouldn't' they come and do it? BP should have the opportunity, hopefully, to sit down and talk with these people and talk about an appropriate remediation effort. Go to LDNR and get the plan approved.

> Even if there is no award here, that can be done. Remember, Mr. Pooler said you never lose as an operator or lessee on an oil and gas lease, you never lose the obligation to address whatever you did out there. Ever.

> And so this can be accomplished. They simply and very carefully - - there can be a hearing if necessary, Sweet Lake can ask for that. And this can all be worked out by them.

> So there may be an opportunity for plaintiffs - - and they have a right if they choose to respond and get up again - - that's the second bite at the apple. So I would suggest to you as we sit here, what you've seen and what you've witnessed for the last almost three weeks is an effort to prove something that whether or not this lawsuit - - according to the plaintiffs - - and it's their burden - - is really about what's on the property and what is the process to deal with it.

> *BP is committed, stands ready as Mr. Vickers testified to. It will address in whatever fashion necessary, whatever LDNR says, whatever this Court says, they are going to do.*

> *And that is the way and the appropriate way to address this, not through an award of however many million dollars - - and I'm sure they're not concerned that it's one or the other, they'll take whatever you can give - - if in fact they're entitled to it.*

> . . . .

> *And we believe as you look at this you will agree there is no reason whatsoever to destroy this property in an attempt to have some award.*

---

[21] Former BP employee Troy Vickers offered general testimony regarding BP's policies regarding its oilfield sites.

> *What is necessary is to clean up the property appropriately and as necessary and allow that to be done. I appreciate your patience and your kindness.*

(Emphasis added.)

By opening and closing its presentation to the jury in this manner, BP made a strategic choice and acknowledged 1) environmental damage, at least to an extent; 2) its responsibility for that environmental damage, at least to the extent required by law; and 3) its responsibility for that damage within the confines of the regulatory process. By doing so, BP provided the jury with a path to relieve BP of the expansive and costly contamination and remediation plans urged by Sweet Lake, as well as Sweet Lake's additional private damages claims. The jury accepted BP's approach, returning a verdict reflecting only the regulatory cleanup offered by BP and required by law.

Given BP's patent admission in furtherance of that strategy, it cannot now argue that the jury manifestly erred in finding either environmental damage, or that it was responsible for a regulatory cleanup. BP instead purposefully conceded both issues in pursuit of the strategy of having the jury reject Sweet Lake's tort and contract claims against BP in favor of the regulatory procedure acknowledged by BP. The strategy proved successful in hindsight as the jury did just as BP requested. The trial court's referral to LDNR simply followed that determination by operation of the procedures as set forth in La.R.S. 30:29. BP cannot now claim that its acknowledged responsibility was in error.

Moving beyond BP's judicial confession, we further reject BP's primary contention that the jury's verdict is inconsistent. BP contends that a "legal admission" of responsibility can only exist under La.R.S. 30:29 if there is an

independent basis for private liability outside of that statute. BP, however, raises the specter of inconsistency as if it was objectively true, i.e., that the regulatory remedy must fail because the fact finder determined that the plaintiff did not prove breach of obligations in tort or contract. However, BP does not, per se, challenge the finding of "responsibility," only the trial court's implementation of post-trial procedures absent proven private claims. Louisiana Revised Statutes 30:29(H) contains no provision making the regulatory remedy contained therein *dependent* on a private cause of action. Instead La.R.S. 30:29(H), as amended in 2012, explicitly recognizes the *independence* of *private causes of action*, stating:

> This Section shall not preclude any owner of land from pursuing a judicial remedy or receiving a judicial award for private claims suffered as a result of environmental damage, except as otherwise provided in this Section. Nor shall it preclude a judgment ordering damages for or implementation of additional remediation in excess of the requirements of the plan adopted by the court pursuant to this Section as may be required in accordance with the terms of an express contractual provision. Any award granted in connection with the judgment for additional remediation is not required to be paid into the registry of the court. *This Section shall not be interpreted to create any cause of action or to impose additional implied obligations under the mineral code or arising out of a mineral lease.*

(Emphasis added.)

The two independent avenues for remedy—regulatory and private—is further reflected throughout the jurisprudence that followed the enactment of La.R.S. 30:29. Determinative in this case is the supreme court's recent decision in *State of Louisiana v. Louisiana Land & Exploration*, 20-685 (La. 6/30/21), _ So.3d _[22] (*La. Land & Expl. II*), a case rendered after BP and Sweet Lake filed their initial briefs.[23]

---

[22] 2021 WL 2678913.

[23] *La. Land & Expl. II* was rendered June 30, 2021. Sweet Lake addressed that release by its July 9, 2021 "Reply and/or Supplemental Opposition Brief of the Sweet Lake Land and Oil Co., LLC, Appellee to BP's Reply Brief and Opposition to Answer to Appeal." Although BP's briefing period had closed by that period, this court granted BP's motion to file a supplemental reply brief

Like the present case, *La. Land & Expl. II* involved a jury's verdict finding a defendant, UNOCAL, responsible for environmental cleanup pursuant to La.R.S. 30:29. UNOCAL asserted on appeal that the jury's verdict was inconsistent as it involved a referral to LDNR but a rejection of the plaintiff's contract claim. The supreme court explained that the jury's verdict was not inconsistent "when viewed in light of the **improper jury instructions given to them**" and that:

> Essentially, they were told to find UNOCAL liable for remediation damages. They were told to assess and find the amount of damages necessary to remediate the land. They were properly instructed on the law as regards strictly liability, contract claims, and the other various private causes brought by VPSB. This was all done in light of this Court's 2013 [*State of Louisiana v. Louisiana Land & Expl. Co.*, 12-0884 (La. 1/30/13), 110 So.3d 1038 (*La. Land & Expl. I*)] decision, which we now see with clarity, was made in error.

*Id.* at _ (emphasis added).

BP relies, in part, on *La. Land & Expl. I* in its appellant's brief, suggesting that the earlier decision indicates that "to trigger the remedial provision under [Act 312]—a most feasible plan and attorney's fees—a plaintiff must first prove a tort, breach of contract, or other private law claim[,] and *then* satisfy the additional requirement of the Act—establishing environmental damage." It quotes that aspect of the case in which the supreme court originally stated in *La. Land & Expl. I*, 110 So.3d at 1058 that, "Only after all of the plaintiffs' *claims* have been heard, and a finding is made the plaintiffs are entitled to remediation of the property, will the *procedure* mandated in La.R.S. 30:29 come into play[.]"

In *La. Land & Expl. II*, _ So.3d at _, however, the supreme court explained:

> *La. Land & Expl. I* included two critical errors that now make up the implicit arguments by UNOCAL. More importantly, that previous

---

in order to address *La. Land & Expl. II*. BP filed its reply brief on July 8, 2021. We note that the Louisiana Supreme Court has now granted a rehearing in that case. *See La. Land & Expl. II*, 20-685 (La. 10/19/21), _ So.3d _ (2021 WL 4859941).

decision gave rise to the complete confusion noted by the court of appeal and by VPSB as to what the Legislature's intended proper role for the jury in remediation decisions exactly entails, and the confusion caused by the jury's seemingly consistent [sic] verdict in this case. The *La. Land & Expl. I* Court incorrectly held that excess remediation damages were allowed under Act 312. *La. Land & Expl. I*, 12-0884, p. 22, 110 So.3d at 1054. Essentially, the misguided decision allowed the following: (1) juries to decide the amount of damages necessary to remediate land to department standards; and (2) juries could award to the petitioner-landowners damages in excess of actual costs to remediate the land. We need look no further than the plain language of Act 312 itself to recognize this Court's prior error. We also note the Legislature cured this court's error by amendment in 2014 to La.R.S. 30:29(M) (2014).[24]

In so ruling, the supreme court referenced Act 312, now La.R.S. 30:29, as the

"primary source of law," noting that the legislation,

**did not allow for juries to determine the amount of damages necessary to fund remediation of land to government standards. It also did not allow for petitioner-landowners to obtain an award for remediation damages in excess of the amount necessary to fund the**

---

[24] As amended in 2014, La.R.S. 30:29 provides:

M. (1) In an action governed by the provisions of this Section, damages may be awarded only for the following:

(a) The cost of funding the feasible plan adopted by the court.

(b) The cost of additional remediation only if required by an express contractual provision providing for remediation to original condition or to some other specific remediation standard.

(c) The cost of evaluating, correcting or repairing environmental damage upon a showing that such damage was caused by unreasonable or excessive operations based on rules, regulations, lease terms and implied lease obligations arising by operation of law, standards applicable at the time of the activity complained of, provided that such damage is not duplicative of damages awarded under Subparagraph (a) or (b) of this Paragraph.

(d) The cost of nonremediation damages.

(2) The provisions of this Subsection shall not be construed to alter the traditional burden of proof or to imply the existence or extent of damages in any action, nor shall it affect an award of reasonable attorney fees or costs under this Section.

As in *La. Land & Expl. II*, however, the 2014 amendment is inapplicable in this case as the enacting legislation provided: "The provisions in this Act shall not apply to any case in which the court, on or before May 15, 2014, has issued or signed an order setting the case for trial, regardless of whether such trial setting is continued." 2014 La. Acts No. 400, § 3. The designated record in this case indicates that early trial settings were before that date.

**remediation plan, except in specific and expressly allowed exceptions.**

*Id.* at _ (emphasis added). Observing the rules of statutory construction and what it described as the "plain, unambiguous language of Act 312," the supreme court concluded that its earlier decision in *La. Land & Expl. I* constituted "palpable error[.]" *Id.* at _. It reasoned that the doctrine of the law of the case did not require it to "blindly adhere" to its "previous, incorrect interpretation of the plain language and intent of Act 312[.]" *Id.* at _.

The supreme court further specifically ruled:

Act 312 is clear and unambiguous: (1) outside of an express contractual provision, Act 312 does not allow for remediation damages in excess of those required to fund the court adopted remediation plan; (2) *the plan is left to the sole judgment of the trial court itself, not the jury; and therefore*, (3) Act 312 provides *no intent for the jury to decide the amount of remediation damages that meet Act 312 compliance.* Act 312 only allows the jury to award *excess remediation damages* when an *express contractual provision* providing for *such an award exists.* Outside of any express contractual provision being present, *it is error to have the jury consider any damages related to Act 312 remediation of the property. The jury's sole role is to consider liability and damages for private causes of action, as well as for contractual causes of action where an express provision allows for remediation and damages in excess of governmental standards.*

Outside of these two exceptions, "all damages or payments in any civil action, including interest thereon, awarded for the evaluation or remediation of environmental damage shall be paid exclusively into the registry of the court in an interest-bearing account with the interest accruing to the account for clean up." La.R.S. 30:29(D)(1)(2006). Thereafter, if the trial court determines additional funds are necessary to implement the court adopted remediation plan, it may order the responsible party or parties to deposit additional funds into the registry of the court. La.R.S. 30:29(D)(4)(2006). Otherwise, any excess funds remaining in the registry after the completion of the remediation plan shall be returned to the depositor upon court order. *Id.*

*Id.* at _[25] (emphasis added).

---

[25] It is unquestioned in this case that the contractual provisions ensuring remediation in excess of government standards arose only with the 2003 Amendment and 2008 Lease. BP was

33

Returning to Defendant's UNOCAL's argument in *La. Land & Expl. II* that the jury verdict was inconsistent, the supreme court further explained:

> In light of the above, it is then evident the jurors, through no fault of their own, improperly considered the amount of damages necessary for Act 312 compliance. In the end, the jury awarded an amount that exceeded the necessary costs to fund the court adopted remediation plan. This occurred in a case where it is undisputed the contracts do not contain express provisions demanding remediation in excess of Act 312 requirements. The jury's verdict ultimately spawned the confusion anchoring the appeal before us.

> We are cognizant that these extraneous instructions and considerations permeated the jury's decisions on the entirety of its verdict. Therefore, we find it appropriate to remand to the trial court for a new trial. This will allow the jury to make a sound verdict, without the confusion of extraneous instructions caused by this Court's previous, incorrect decision in *La. Land & Expl. I.*

> Accordingly, we reverse and vacate the $3,500,000.00 judgment for remediation damages, finding there is not, and never was, statutory support for the award. Rather, specific performance of remediation, *i.e.* the cost of actual clean-up, is appropriate. The feasible plan developed with input of the parties and the LDNR, and adopted by the trial court, is the sole remedy for UNOCAL's limited admission of liability for environmental damage. The remainder of any non-remediation causes of action are remanded to the trial court for a new trial.

*Id.* at _.

The jurors were instructed similarly in this case and were asked to resolve, as they did, questions of "legal responsibility" and "cost to clean up Sweet Lake's property[.]" The jury returned its verdict finding only BP legally responsible and assessing $1.5 million in remediation costs. The jury rejected all tort and contract claims against BP. As recognized by the supreme court in *La. Land & Expl. II*, such "extraneous instructions and considerations" affected the juror's consideration of

---

not a party to either. This court addressed the contractual obligation for that higher level of remediation under both the 2003 Amendment and 2008 Lease in *Sweet Lake I*. The trial court's award of $12,921,124.00 in related damages on remand was rendered against Oleum and AKSM, not BP. That judgment is now final.

private causes of actions against BP. This is particularly true in light of BP's confession of its responsibility for environmental damages and the evidence considering the multi-generational contamination of the oilfield property in this case. As the supreme court did in *La. Land & Expl. II*, we leave undisturbed the trial court's referral to LDNR for the regulatory process of La.R.S. 30:29.[26]

## BP Assignment of Error Number 3

*Fees and Costs*

BP argues that the trial court erred in awarding *all* attorney fees, expert fees, and costs incurred as of the time of the hearing. It seeks, instead, an award tailored to Sweet Lake's limited claim leading to the referral to LDNR. Sweet Lake successfully argued to the trial court that the totality of all fees and expenses incurred in the overall litigation, including unsuccessful claims, were recoverable under La.R.S. 30:29. The trial court ordered all incurred fees/costs to date, making all defendants liable *in solido*.

Louisiana Revised Statutes 30:29(E)(1) provides:

E. (1) In any civil action in which a party is responsible for damages or payments for the evaluation or remediation of environmental damage, a party providing evidence, in whole or in part, upon which the judgment is based shall be entitled to recover from the party or parties admitting responsibility or the party or parties found legally responsible by the court, in addition to any other amounts to which the party may be entitled, all costs attributable to producing that portion of the evidence that directly relates to the establishment of environmental damage, including, but not limited to, expert witness fees, environmental evaluation, investigation, and testing, the cost of developing a plan of remediation, and reasonable attorney fees incurred in the trial court and the department.

---

[26] We are, as noted earlier, cognizant that the Louisiana Supreme Court has granted a rehearing in *La. Land & Expl. II*. However, when and until the supreme court's ruling in that case is vacated, we agree with the rationale of that decision and apply it herein.

BP suggests that the provision identifies limited, recoverable costs as those 1) "attributable to producing that portion of evidence that directly relates to the establishment of environmental damages;" 2) incurred in the trial court or department; and only those that are 3) reasonable. BP contends that this limitation reflects the legislature's intent to distinguish successful remediation claims governed by the statute from those for private causes of action. It argues that an award of the totality of fees and costs for pursuit of what it terms as "unsuccessful claims" is contrary to the provision's explicit recognition that La.R.S. 30:29 neither creates an independent right/cause of action, nor does it affect private causes of action. BP thus contends that the figure awarded should be reduced to reflect only: 1) fees/costs associated with claims against BP and 2) work in the trial court and LDNR through the time of establishment of environmental damage as reflected by the jury verdict of May 27, 2015. It suggests that the invoices support an award of attorney fees of no more than $1,297,975.80 and expert fees of $1,279,001.99. The latter figure reflects the work of only two of Sweet Lake's four experts.

In contrast, Sweet Lake argues that the trial court's award for *all* fees and costs is appropriate as it proved that BP was, in fact, "responsible for environmental damage on the property." Sweet Lake argues that BP focuses too narrowly on La.R.S. 30:29(E)(1)'s provision for fees and costs, and BP's argument that fees and costs should be restricted to "producing that portion of the evidence that directly relates to the establishment of environmental damages." Sweet Lake instead argues that the provision must be viewed as providing for three categories of fees and costs as reflected by the three bracketed phrases below:

> E. (1) In any civil action in which a party is responsible for damages or payments for the evaluation or remediation of environmental damage, a party providing evidence, in whole or in part, upon which the

judgment is based shall be entitled to recover from the party or parties admitting responsibility or the party or parties found legally responsible by the court, in addition to any other amounts to which the party may be entitled, **[1]** *all costs attributable to producing that portion of the evidence that directly relates to the establishment of environmental damage, including, but not limited to, expert witness fees, environmental evaluation, investigation, and testing*, **[2]** *the cost of developing a plan of remediation*, and **[3]** *reasonable attorney fees incurred in the trial court and the department*.

La.R.S. 30:29 (emphasis added).

Sweet Lake notes that the legislature chose to begin each phrase with "cost" or "fee," denoting its intent to create three categories of recovery. Sweet Lake contends that BP's assertion that the provision creates only one category of fees and costs ignores basic rules of statutory interpretation and punctuation usage. *Citing State v. Thomas*, 26,116 (La.App. 2 Cir. 6/22/94), 639 So.2d 408, *writ denied*, 94-2332 (La. 1/13/95), 648 So.2d 1337. Practically, Sweet Lake argues that BP's interpretation is too narrow. Given its more expansive view of Paragraph (E)(1), Sweet Lake contends that all claimed fees and costs fit within one of the three categories.

While the parties present compelling statutory construction arguments, the parsing of the legislature's phraseology overlooks the reality of the presentation of this case, which necessarily involves remediation arising under La.R.S. 30:29, as well as claims outside of that regulatory context, *i.e.*, Sweet Lake's tort and contract claims disallowed by the jury, but for which there has been no final judgment rendered in the trial court. Although the conduct of any given defendant may result in damages above or even separate from the statutorily required remediation, the development and presentation of that evidence is necessarily attributable to "producing evidence that directly relates to the establishment of environmental

damage." Sweet Lake successfully presented a case that resulted in referral for the La.R.S. 30:29 remediation process as well as significant contractual damages against two of its operators. The totality of Sweet Lake's recovery stemmed from the underlying environmental damage, which was successfully established by BP's confession as well as the record evidence on this issue. To require post-trial, line-item identification of each report, cost, expert fee, and attorney fee, by *degree of contribution* to the underlying environmental damage, as BP suggests, ignores the overall purpose of the statute to protect, conserve, and replenish the natural resources of the state as required by La.Const. art. 9, § 1.[27] The legislature explicitly incorporated its purpose in enacting La.R.S. 30:29(A) within its text, echoing Article 9, § 1 and providing:

> The legislature hereby finds and declares that Article IX, Section 1 of the Constitution of Louisiana mandates that the natural resources and the environment of the state, including ground water, are to be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people and further mandates that the legislature enact laws to implement this policy. It is the duty of the legislature to set forth procedures to ensure that damage to the environment is remediated to a standard that protects the public interest.

We accordingly maintain the trial court's determination that Sweet Lake "is entitled to recover all of the fees and costs submitted with the Motion to Assess Fees and Costs pursuant to La.R.S. 30:29" and affirm the trial court's partial final judgment in its entirety.

---

[27] Louisiana Constitution Article 9, § 1 provides:

> The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

**BP Assignment of Error Number 4**

*Solidary Liability for Fees and Costs*

BP also challenges the trial court's casting it in judgment for fees and costs *in solido* with Oleum and AKSM. In its argument in its appellants' brief, BP points out that neither the jury nor the trial court made a determination regarding solidarity of the parties' actions and that the parties' liability rested on independent bases. BP, alone, was liable under La.R.S. 30:29, and the other two defendants were liable in contract.

While true that the trial court did not elaborate on its finding that the parties were solidary obligors, it made a specific determination in that regard nonetheless as it explained in ruling on fees and costs: "There was an issue about whether these warrants [sic] can be solidary - - whether there the Defendants are solidary obligors or not. I do find that based on the - - my interpretation of the law that the Defendants are solidary obligors in this matter." We leave that determination undisturbed as each party shared liability for at least a baseline of remediation in this case. *See* La.Civ.Code art. 1794. As stated above, the award of fees and costs all originated in the claim that centered on that remediation.

Furthermore, while BP may have been held responsible for regulatory remediation under La.R.S. 30:29, Oleum and AKSM assumed not only a remediation obligation by operation of law, but one at a higher level by contract. This alternative source of obligation is of no moment as La.Civ.Code art. 1797 provides that "[a]n obligation may be solidary though it derives from a different source for each obligor."

Accordingly, we maintain the trial court's award as rendered.

## BP Assignment of Error Numbers 5 and 6

*Exceptions of Prescription and Res Judicata*

During the pre-trial history of this case, the trial court overruled BP's exceptions of prescription and res judicata. The trial court's ruling denying the exception of res judicata was maintained following writ review by this court.[28] The trial court's decision overruling the exception of prescription was likewise maintained following writ review both by this court and, in turn, the supreme court.[29]

BP presents its arguments as to the trial court's alleged error on these exceptions only in the alternative and only in the event this court chose to grant Sweet Lake's Answer to Appeal and consider B.P.'s liability in tort and contract. As noted infra, this court dismisses Sweet Lake's Answer to Appeal as premature, in part, and notes that the trial court has not yet signed a final judgment on the merits of Sweet Lake's tort and contract claims against B.P.

## Sweet Lake's Answer to the Appeal and BP's Motion to Dismiss Answer

As addressed above, BP asserted by its second assignment of error, that "[t]he Trial Court erred in implementing the post-trial procedures established by La.R.S. 30:29 – establishment of a most feasible plan and awarding attorney's fees – when the jury found BP not liable to Sweet Lake **under any theory of liability**." (Emphasis added).

---

[28] *See, e.g., Sweet Lake Land & Oil Co., LLC v. Oleum Operating Co., et al.*, 14-535 (La.App. 3 Cir. 8/8/14) (an unpublished denial of BP's application for supervisory writ of the overruling of its exception of res judicata).

[29] *See, e.g., Sweet Lake Land & Oil Co., LLC v. Oleum Operating Co., et al.*, 14-319, p. 7 (La.App. 3 Cir. 5/6/14) (an unpublished denial of BP's application for supervisory writ of the overruling of its exception of prescription), *writ denied*, 14-1001 (La. 6/13/14), 141 So.3d 273.

When B.P. did so, Sweet Lake then filed its "Answer to Appeal" which specifically alleged "The jury manifestly erred in finding that BP had not breached the mineral lease by negligence or excessive or unreasonable use." Sweet Lake in turn requested a new trial on the jury's rejection of its private tort and contract claims in its Answer to the Appeal.

We find however that Sweet Lake's request is premature as the trial court has not yet rendered a final judgment on the merits of its tort and contract claims in this case. This partial appeal applies only to the issue of the trial court's judgment dated July 28, 2020 on the issue of attorney fees and costs to date. We accordingly grant BP's Motion to Dismiss Answer in this limited regard.

Sweet Lake also argues that its Answer must be maintained with regard to its plea for additional attorney fees for work performed on appeal, as those relate directly to its defense of the July 2020 judgment awarding fees and costs. *See Gloria's Ranch, L.L.C. v. Tauren Expl., Inc.*, 17-1518, p. 23 (La. 6/27/18), 252 So.3d 431, 446 ("Additional attorney fees for work done on appeal can be available when a party is entitled to an attorney fee by statute or contract, actually receives one at trial, and defends the defendant's unsuccessful appeal."). *See also Deshotels Plantation, LLC v. Torrent Gulf Coast, LLC*, 19-750 (La.App. 3 Cir. 4/22/20), 297 So.3d 1034. We find that Sweet Lake is entitled to additional fees and costs incurred in its successful defense of BP's appeal of the trial court's judgment in favor of Sweet Lake and against B.P. in the total amount of $5,330,479.72 and deny BP's motion to dismiss answer on this issue.

Accordingly, we below render judgment in favor of Sweet Lake and against BP for attorney fees for work performed in defending this appeal in the amount of $25,000.00.

**DECREE**

For the foregoing reasons, the July 28, 2020 judgment of the trial court in favor of The Sweet Lake Land and Oil Company, Limited Liability Company and against BP Products North America, Inc., BP Exploration & Oil, Inc., BP Exploration, Inc., in the amount of $5,330,479.11 in attorney fees, expert fees and costs is affirmed in full. The judgment is further affirmed to the extent it found BP "liable *in solido* for the attorneys' fees, expert fees, and costs and interest thereon" with AKSM, L.C. and Oleum Operating Company, L.C.

Judgment is further rendered in favor of Appellee The Sweet Lake Land and Exploration Company, Limited Liability Company and against Appellants BP Products North America, Inc., BP Exploration & Oil, Inc., BP Exploration, Inc., and Sohio Petroleum Company in the amount of $25,000.00 for attorney fees for work performed on appeal. The Motion to Dismiss Answer, filed by Appellants BP Products North America, Inc., BP Exploration & Oil, Inc., BP Exploration, Inc., and Sohio Petroleum Company, is otherwise granted.

All appellate court costs are assigned to Appellants BP Products North America, Inc., BP Exploration & Oil, Inc., BP Exploration, Inc., and Sohio Petroleum Company.

This matter is remanded to the trial court for further proceedings consistent with this opinion.

**AFFIRMED AND RENDERED.**
**MOTION TO DISMISS ANSWER GRANTED IN PART**
**AND DENIED IN PART.**
**ATTORNEY FEES AWARDED FOR WORK PERFORMED ON**
**APPEAL.**
**REMANDED.**

THE SWEET LAKE LAND AND OIL COMPANY, LLC

VERSUS

OLEUM OPERATING COMPANY, L.C., ET AL.

**Pickett, J., dissents and assigns written reasons.**

I respectfully dissent from the majority's decision to affirm the judgment of the trial court awarding attorneys' fees, expert fees, and costs. I concur in the opinion to the extent that it dismisses the answer to the appeal filed by The Sweet Lake Land and Oil Company. For the reasons expressed herein, I would dismiss the appeal as atken from a non-appealable judgment.

Courts have long cautioned that piecemeal appeals are not favored. Our supreme court expressed this sentiment in *R.J. Messinger, Inc. v. Rosenblum*, 04-1664, p. 13 (La. 3/2/05), 894 So. 2d 1113, 1122:

> Historically, we have a policy against multiple appeals and piecemeal litigation. We also ensure that our courts operate under principles of sound judicial administration to promote judicial efficiency and economy. The United States Supreme Court, discussing determination of whether there is no just reason for delay under Fed. R. Civ. Pro. 54, declared a district court must take into account judicial administrative interests as well as the equities involved. *Curtiss–Wright* [*Corp. v. General Elec. Co.*], 446 U.S. [1,] 8, 100 S.Ct. [1460,] 1465. Consideration of judicial administrative interests is necessary to assure that application of the Rule effectively "preserves the historic federal policy against piecemeal appeals." *Id.* citing *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 438, 76 S.Ct. 895, 901, 100 L.Ed. 1297 (1956). Article 1915, like Rule 54, attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties. Therefore we find a rule requiring remand or dismissal when the trial court fails to give explicit reasons for its determination, even when the propriety of immediate appeal is apparent, would not optimally balance the competing concerns that should inform the court's interpretation of article 1915.

In this case, the trial court clearly stated reasons for certifying this appeal of an award of fees and costs as a final judgment for the sake of allowing an immediate appeal. In response, the plaintiff filed an answer to the appeal seeking reversal of the jury's verdict. I would find the trial court abused its discretion in making the determination that the judgment should be certified as final, and I would dismiss the appeal.

In *Messinger*, the supreme court held that a trial court should give reasons for certifying a judgment as final, although the failure of the trial court to give reasons does not invalidate the certification. Pursuant to *Messinger*, the appellate court is tasked with review of the certification of the judgment as final to determine if the trial court abused its discretion.

The judgment at issue in this appeal, as it relates to BP, states as follows:

> The Court hereby renders partial final judgment in favor of plaintiff, Sweet Lake, and against defendants, BP Produsts North America, Inc., BP Exploration & Oil, Inc., BP Exploration, Inc., and Sohio Petroleum Co. (collectively "BP"), holding BP responsible for environmental damage on Sweet Lake's property in Section 34, Township 10 South, Range 6 West, Calcasieu Parish, Louisiana (the "Property).

> The Court hereby renders final judgment in favor of plaintiff, Sweet Lake, and against defendants AKSM, L.C. and Oleum Operating Co., L.C., and partial final judgment in favor of Sweet Lake, and against BP for $5,330,479.11 in attorneys' fees, expert fees and costs, consisting of $3,201,824.39 in attorneys' fees and costs and $2,128,654.72 in expert fees and costs, with legal interest on said attorneys' fees, expert fees, and costs from the date of this judgment. AKSM, L.C., Oleum Operating Company, L.C., and BP are liable *in solido* for the attorneys' fees, expert fees, and costs and interest thereon.

> The relief granted in favor of Sweet Lake and against BP in this judgment is designated as a partial final judgment because there is no just reason for delay of the Court's ruling that BP is responsible for environmental damage and liable, *in solido* with AKSM, L.C. and Oleum Operating Company, L.C. for Sweet Lake's attorneys' fees, expert fees, and costs.

> BP's Motion for Approval of Proposed Work is denied.

AKSM, L.C., Oleum Operating Company, L.C., and BP are hereby taxed with all costs of these proceedings.

I find that the factors set forth in *Messinger* do not support a finding of immediate appealability. I find that the adjudicated claims subject to the judgment (attorneys' fees, expert fees, and costs) are dependent on claims still unresolved in the court below. The trial court has yet to render a final judgment on the merits of the underlying claims for remediation. The entitlement to attorneys' fees, expert fees, and costs hinges on whether the decisions made in the court below are upheld. Further, the opinion makes clear that the trial court may award additional attorneys' fees, expert fees, and costs, so the judgment certified as final does not even adjudicate the entirety of the limited claim before it.

I agree that this case has dragged on for six years since trial, but I do not find that in itself constitutes "no just reason for delay." The requirements of La.R.S. 30:29 do not facilitate a speedy resolution of cases, given the introduction of LDNR as a key player in remediation planning and oversight.